JS6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5890 | **DATE** | 4/28/2004 |
| **CASE TITLE** | Myrick vs. Aramark Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, defendant's motion for summary judgment [14-1] is granted. Judgment is entered in favor of the defendant and against the plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 29 2004 | |
| | Notified counsel by telephone. | | date docketed | 22 |
| ✓ | Docketing to mail notices. | | JXM | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/28/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IDA L. MYRICK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 02 C 5890 |
| ) | Judge Joan H. Lefkow |
| ARAMARK CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ida L. Myrick ("Myrick"), brings this action against defendant, Aramark Services Inc. ("Aramark"), improperly named as Aramark Corporation, alleging that she was terminated from her employment based on her race, sex and pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as amended by the Pregnancy Discrimination Act ("PDA").[1] In addition, Myrick also alleges violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2101 *et seq.* Pending before the court is Aramark's motion for summary judgment. For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and

---

[1] Myrick also alleges discrimination in violation of 42 U.S.C. § 1981.

affidavits that are part of the record. Fed R. Civ. P. 56(c) Advisory Committee's notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## FACTS STATED IN A LIGHT MOST FAVORABLE TO PLAINTIFF[2]

Aramark manages on-site restaurants, catering and office services for businesses. (Def. L.R. 56.1 ¶ 3.) At all times relevant to this action Aramark managed a cafeteria-style restaurant

---

[2]Local Rule 56.1(a) provides that a motion for summary must include, *inter alia*, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." This statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." Part (b) of Local Rule 56.1 requires a party opposing summary judgment to file, *inter alia*, a concise response to the movant's statement of material facts. For purposes relevant here, that statement is required to include a response to each numbered paragraph in the moving party's statement, including in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon." The rule is very clear that "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3)(B). In response to Aramark's paragraphs 40, 45, 63, 64, 70, 77 and 80, Myrick neither admits nor denies the facts asserted. Instead, she claims, with little explanation and no citation to authority, that these paragraphs involve matters "not proper for determination on summary judgment." This argument notwithstanding, the Local Rules do not envision such a response, *see, e.g., Hall* v. *Thornton Fractional Township High Sch. Dist. No. 215*, No. 99 C 1433, 2000 WL 1644548, at *5 (N.D. Ill. Oct. 24, 2000), and since Myrick did not controvert these statements, they are deemed admitted. *E.g., Bordelon* v. *Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).

at an office complex called the Parkway Center located in Deerfield, Illinois. (Def. L.R. 56.1 ¶¶ 3-4.) Myrick, who is African-American, was employed by Aramark at the Parkway Center from July 17, 1995 to July 13, 2001. (Def. L.R. 56.1 ¶ 4.) Myrick's supervisor at the Parkway Center, beginning in December 1999, was Jeff Yore ("Yore"). (Def. L.R. 56.1 ¶ 7.) Jake Sweeney ("Sweeney") was also employed with Aramark at the Parkway Center from approximately June 1998 to June 2000, serving as a General Manager with responsibility for operations. (Def. L.R. 56.1 ¶ 8.)

Also relevant to this action are Kate Maney ("Maney") and Maria Araiza ("Araiza"). Maney is the Human Resources Director for the Midwest Region of Aramark, a position she has held since October 2000. (Def. L.R. 56.1 ¶ 5.) Her responsibilities include human resource matters relating to the Parkway Center. (*Id.*) Maria Araiza ("Araiza") is a Human Resources Administrator for Aramark, a position she has held since February 2001. (Def. L.R. 56.1 ¶ 6.) Araiza reports to Maney. (*Id.*) Both Maney and Araiza have their offices located in Oakbrook Terrace, Illinois. (Def. L.R. 56.1 ¶¶ 5-6.) At no time during Myrick's employment was either Maney or Araiza aware of Myrick's race. (Def. L.R. 56.1 ¶ 77.)

When hired Myrick performed catering and cashier work at the Parkway Center. (Def. L.R. 56.1 ¶ 9.) In October 1996, she was promoted to the position of bookkeeper. (Def. L.R. 56.1 ¶ 10.) As a bookkeeper her hours were from 7:00 a.m. to 3:30 p.m. (Def. L.R. 56.1 ¶ 12.) Her duties included performing payroll functions, preparing certain weekly reports and handling and invoicing catering orders. (Def. L.R. 56.1 ¶ 13.) Myrick was the only bookkeeper assigned to the Parkway Center and received high scores on her evaluations. (Def. L.R. 56.1 ¶ 14; Pl. L.R. 56.1 ¶ 108.) After August 1998, Myrick began performing the job of "office manager" although

3

she was still being paid as a bookkeeper. (Pl. Resp. to Def. L.R. 56.1 ¶ 13.) As office manager Myrick was performing the same job but also began ordering more office supplies. (Def. L.R. 56.1 ¶ 18.) She received high scores on her evaluations while serving as an office manager. (Pl. L.R. 56.1 ¶ 109.)

Myrick became pregnant in October 2000 and was scheduled to deliver her baby on July 21, 2001. (Def. L.R. 56.1 ¶ 21.)[3] She had complications with her pregnancy, including a fibroid tumor that was discovered in December 2000 and gestational diabetes diagnosed in January 2001. (Def. L.R. 56.1 ¶ 22.) Myrick's physician during her pregnancy was Dr. Steven Portes ("Dr. Portes"). (Def. L.R. 56.1 ¶ 23.) On April 22, 2001, Myrick went into premature labor. (Def. L.R. 56.1 ¶ 24.) The next day–April 23, 2001–Myrick saw Dr. Portes. (Def. L.R. 56.1 ¶25.) He advised Myrick that she could no longer work during her pregnancy. (Pl. Resp. to Def. L.R. 56.1 ¶ 25.) The last day Myrick worked at the Parkway Center was April 20, 2001. (Def. L.R. 56.1 ¶ 26.)

On April 23, 2001, Myrick called Yore from Dr. Portes' office to notify him of her need for leave from work. (Def. L.R. 56.1 ¶ 27.) Yore contacted Araiza regarding Myrick's request for leave. (Def. L.R. 56.1 ¶ 28.) Araiza sent Yore a packet that included information on family and medical leave, a blank leave of absence form, and an FMLA "Certification of Health Care Provider" form. (*Id.*) Araiza instructed Yore to have Myrick complete the leave of absence form and to have her doctor complete the "Certification of Health Care Provider" form. (Def. L.R.

---

[3]Myrick had twice before taken leave for the birth of her two other children. (Pl. L.R. 56.1 ¶ 118.) These leaves were each eight weeks in length. (Def. L.R. 56.1 ¶ 19.) Myrick attaches as her exhibit 4 two documents, one of which refers to this leave as "maternity leave" that is unpaid and "the employee will be receiving no compensation from the company" while on such leave. (Pl. Ex. 4 at 0593.) Myrick was reinstated to her job and suffered no adverse consequences following her 1995 and 1997 leaves. (Def. L.R. 56.1 ¶¶ 19-20.)

4

56.1 ¶ 29.) Araiza told Yore to return the forms to her when they were completed and advised that Myrick's leave likely would be covered under the FMLA, entitling her to up to 12 weeks of leave with guaranteed reinstatement if Myrick returned to work within that time. (*Id.*)

Yore sent both the leave of absence and "Certification of Health Care Provider" forms to Myrick. (Def. L.R. 56.1 ¶¶ 30-31.) He informed Myrick that human resources had told him that she needed to complete both. (*Id.*) After receiving the leave of absence form Myrick signed it and returned it to Yore. (Def. L.R. 56.1 ¶ 33.) Accompanying the leave of absence form was a disability certificate that Dr. Portes had signed. (Def. L.R. 56.1 ¶ 34.) This disability certificate indicated that Myrick would be unable to work from April 23, 2001 to "indefinite." (*Id.*) Moreover, the leave of absence form Myrick completed also stated that the start date of her leave would be April 23, 2001 and her anticipated return date would be "indefinite." (Def. L.R. 56.1 ¶ 35.)

Araiza received the completed leave of absence form from Yore in May 2001. (Def. L.R. 56.1 ¶ 36.) After receiving the form, Araiza telephoned Yore and told him that she still needed to receive the completed "Certification of Health Care Provider" form for Myrick. (Def. L.R. 56.1 ¶ 37.) Yore told her that he had not yet received that form from Myrick but that he would forward it once he did. (Def. L.R. 56.1 ¶ 37.)

Araiza placed the leave of absence form in the "for signature" file of Jim Miller, the Regional Vice President for Aramark. (Def. L.R. 56.1 ¶ 38.) On June 6, 2001, Miller signed the form in the box on the lower right hand side of the page titled "Second Level Management." (Def. L.R. 56.1 ¶ 39.) He signed the form in this place because District Manager Chris Ferenc had already signed the form in the only other space available for "Second Level Management"

5

signatures. (*Id.*) In signing the form Miller intended to approve the leave of absence for Myrick. (Def. L.R. 56.1 ¶ 40.) His signature fell into the "Leave Denied" column because there was no other space available on the form for him to sign his name. (*Id.*)

Myrick later had Dr. Portes complete the "Certification of Health Care Provider" form and Dr. Portes' office faxed the completed form to Yore. (Def. L.R. 56.1 ¶ 42.) In late June 2001, Araiza received a facsimile from Yore containing the completed "Certification of Health Care Provider" form for Myrick. (Def. L.R. 56.1 ¶ 43.) This form was then given to Maney, who noticed that Myrick's leave began on April 23, 2001. (Def. L.R. 56.1 ¶ 45.) Maney calculated Myrick's leave up to July 13, 2001, based on her knowledge that the FMLA provided 12 weeks of leave during a 12 month period. (*Id.*) Maney wrote "12 weeks up 7-13-01" on the bottom of the leave of absence form when she signed the form on July 10, 2001. (*Id.*)

On June 2, 2001, Myrick's baby was delivered by caesarean section. (Def. L.R. 56.1 ¶ 46.) After her delivery, Dr. Portes told Myrick that it would take 10 to 12 weeks for her body to heal externally and a year to heal internally. (Def. L.R. 56.1 ¶ 47.) Dr. Portes specifically told Myrick that she could not return to work for 10 to 12 weeks. (*Id.*) Dr. Portes never gave Myrick a note documenting her 10 to 12 week work restriction and Myrick never asked him for one. (Def. L.R. 56.1 ¶ 48.) Myrick called Yore on June 2 and left a voicemail message for him stating that her doctor told her that it would take 10 to 12 weeks for her body to heal. (Def. L.R. 56.1 ¶ 49.) Myrick explained this to Yore over the telephone upon reaching him on June 4, 2001. (Def. L.R. 56.1 ¶ 50.) Thereafter, Myrick did not attempt communication with Yore until the end of June or the beginning of July when she left a voicemail message for him explaining that she was still on bed rest. (Def. L.R. 56.1 ¶ 52.)

Myrick had previously received Aramark's Midwest Business Services Hourly Employee Handbook and appendix. (Def. L.R. 56.1 ¶ 57.) While on her leave, but prior to her termination, Myrick read the Family and Medical Leave policy contained within that handbook. (Def. L.R. 56.1 ¶ 58.) The Family and Medical Leave section of the handbook stated,

> Employees who return to work from a family leave of absence within or on the first scheduled day following the expiration of the 12 weeks are entitled to return to their job or an equivalent position without loss of benefit pay.

(Def. L.R. 56.1 ¶ 59.) Aramark's policy relating to leave of absences is that employees who take a leave that is not covered under the FMLA or whose leave time exceeds the FMLA's 12 weeks are not guaranteed reinstatement to their prior positions. (Def. L.R. 56.1 ¶ 60.) Specifically, an Aramark memorandum from Araiza to "Front Line Managers" with the subject of "Leaves of Absence" provided, after explaining the requirements of the FMLA,

> An unprotected leave is not covered by the Family Medical Leave Act. This type of leave allows an employee to take a leave of absence without guarantee of position or pay. However, a position should be held for an employee as long as possible without causing undue hardship on the component. Examples of unprotected leave include childcare, educational pursuits and any leave extended past the 12 weeks covered by the FMLA.

(Maney Aff. Ex. 4.)

After Myrick left work to go on leave, Carmen Cervantes ("Cervantes") was transferred from another Aramark cafeteria to work as the bookkeeper at the Parkway Center. (Def. L.R. 56.1 ¶ 61.) Cervantes, who is not African-American, had never worked as a bookkeeper and her initial training and skills were limited. (*Id.*; Pl. L.R. 56.1 ¶ 120.) When Cervantes began work in May 2001 Yore told her that if Myrick returned to the Parkway Center within 12 weeks of the

7

beginning of her leave of absence, Cervantes would not be able to keep her position as bookkeeper at the Parkway Center. (Def. L.R. 56.1 ¶ 62.)

During May, June and July 2001, Yore testified that he felt that Cervantes' lack of job security affected her performance and her willingness to commit the time and energy necessary to learn the bookkeeper duties at the Parkway Center. (Def. L.R. 56.1 ¶ 63.) In approximately late July 2001, Yore telephoned Araiza and asked whether he could make a commitment to Cervantes that she was no longer a temporary fill-in. (Def. L.R. 56.1 ¶ 65.) Araiza told Yore that Myrick had the right to return to her job until her 12 weeks of FMLA leave had expired and that Araiza needed to check with Maney before she could answer. (Def. L.R. 56.1 ¶ 66.) After Araiza spoke with Maney, Maney checked the leave of absence form for Myrick and, since 12 weeks of leave guaranteed under the FMLA had expired and Myrick had not returned to work, Maney told Araiza that she could tell Yore that he could now make a commitment to Cervantes that she was no longer temporary and was the bookkeeper at the Parkway Center. (Def. L.R. 56.1 ¶¶ 67, 68.) Araiza informed Yore as to Maney's response, and after receiving this permission, Yore told Cervantes that she would not lose her position as bookkeeper if Myrick returned. (Def. L.R. 56.1 ¶ 69.)

On August 8, 2001, Myrick called the Parkway Center and was told that Yore was on vacation. (Def. L.R. 56.1 ¶ 71.) She spoke with someone identified as the "new" general manager and that person told Myrick to contact human resources. (*Id.*) On either August 8 or 9, Araiza received a telephone call from Myrick stating that she planned on returning to work on August 20, 2001. (Def. L.R. 56.1 ¶ 72.) Araiza told Myrick that she needed to speak with Maney before she could address Myrick's return to work. (*Id.*) Maney told Arazia that since

Myrick did not return to work within 12 weeks of her leave, she was considered terminated as of July 13, 2001. (Def. L.R. 56.1 ¶ 73.) Thereafter Araiza spoke with Myrick and told her that since 12 weeks of FMLA leave expired on July 13, 2001, and since she had not returned to work immediately following its expiration, her position at the Parkway Center was no longer available. (Def. L.R. 56.1 ¶ 75.) Araiza told Myrick that she was free to apply for any available position with the company, but Myrick responded that she only wanted her job at the Parkway Center. (Def. L.R. 56.1 ¶ 76.) Myrick did not request that Aramark find her another position nor did she reapply for any new job within the company. (Def. L.R. 56.1 ¶ 78.)

Oscar Serna ("Serna") worked at the Parkway Center as one of approximately five cashiers. (Def. L.R. 56.1 ¶¶ 81-82.) Cashier positions at the Parkway Center were entry-level positions with a high rate of turnover. (Def. L.R. 56.1 ¶ 83.) During 1998 and 1999 Serna informed Sweeney on two separate occasions that he needed to go to Mexico. (Def. L.R. 56.1 ¶ 84.) On each occasion Sweeney authorized Serna to leave without pay, benefits, or reinstatement rights and informed him that when he returned Serna would not be guaranteed a job but that Sweeney would look to see if any positions were open and available. (Def. L.R. 56.1 ¶¶ 86-87.)

Another employee, Hector Villa ("Villa"), worked at the Parkway Center as a catering delivery person and also assisted with cold food preparation and in working the grill. (Def. L.R. 56.1 ¶ 89.) Villa was one of approximately ten kitchen support staff members at the Parkway Center. (Def. L.R. 56.1 ¶ 90.) Catering delivery and kitchen help positions at the Parkway Center were entry-level positions with a high rate of turnover. (Def. L.R. 56.1 ¶ 91.) In late 1998 or early 1999, Villa informed Sweeney that he needed to go to Mexico for a period of time

9

for family reasons. (Def. L.R. 56.1 ¶ 92.) Sweeney authorized Villa to leave without pay, benefits or reinstatement rights and informed Villa that if he left, Sweeney could not guarantee him a job when he returned and that Sweeney would have to see if any positions were available at that time. (Def. L.R. 56.1 ¶¶ 93-94.)

When Villa returned from Mexico in 1999, he spoke with Sweeney. (Def. L.R. 56.1 ¶ 95.) Sweeney told Villa that he would see if any positions were available with his qualifications and skills. (Def. L.R. 56.1 ¶ 95.) Within a short time Sweeney was able to place Villa in a position at the Parkway Center. (Def. L.R. 56.1 ¶ 96.) Villa returned to work at the same rate of pay he previously had. (Pl. L.R. 56.1 ¶ 114.)

In early 2001, Villa informed Yore that he needed to go to Mexico because of some family issues. (Def. L.R. 56.1 ¶ 98.) Yore told Villa that he could leave but that he had no job guarantee when he returned. (Def. L.R. 56.1 ¶ 99.) Villa left and returned approximately one and a half months later. (Def. L.R. 56.1 ¶ 100.) When Villa returned he spoke with Yore and asked whether Yore could find him a position at the Parkway Center. (Def. L.R. 56.1 ¶ 101.) Yore was subsequently able to find a position for Villa at the Parkway Center. (Def. L.R. 56.1 ¶ 102.)

Myrick states that throughout her employment Yore made derogatory comments about African-Americans "[a]lmost every day." (Pl. L.R. 56.1 ¶ 136.) For example, Myrick testified,

> He would say things like what you eating for lunch today, Ida? We don't have chicken and watermelon. And stuff like that, different kind of comments like that. And he would only talk to me like that.

(Pl. L.R. 56.1 ¶ 135.) Myrick testified that she was offended by these comments and that Yore did not address non-blacks in the same fashion. (Pl. L.R. 56.1 ¶ 137-38.)

10

## DISCUSSION

### A. Title VII Claims

Myrick alleges that her termination from employment at Aramark was based on either her race, sex or pregnancy, all in violation of Title VII.[4] She may establish that her termination was discriminatory by either direct or indirect proof. *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). Other than to provide one conclusional statement that "[o]pen acknowledgment of racial hostility is direct evidence of discrimination," Myrick does not set forth proof under the direct method. Her perfunctory argument is insufficient. *See, e.g., Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (noting that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Thus, the court analyzes her claims under the indirect method of proof.

Under the burden-shifting method established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Myrick bears the initial burden of producing evidence to sustain a *prima facie* case. If Myrick meets this burden, then Aramark must produce a legitimate, nondiscriminatory reason for its action. If Aramark offers a legitimate nondiscriminatory reason, the burden then shifts back to Myrick to present evidence that the employer's proffered reason is pretextual. *E.g., Adams v. Wal-Mart Stores*, 324 F.3d 935, 939-40 (7th Cir. 2003).

To satisfy a *prima facie* case of discrimination under Title VII, Myrick must show (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was meeting her employer's legitimate performance expectations; and (4) that the employer

---

[4]Claims under Title VII and 42 U.S.C. § 1981 are analyzed in the same manner. *E.g., Logan v. Kautex Textron N. Am.*, 259 F.3d 635, 637 n.1 (7th Cir. 2001).

11

treated similarly situated employees who are not in the protected class more favorably. *E.g.*, *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001).

Parts (1) and (2) of the *prima facie* case are easily satisfied as Myrick was a member of a protected class based on her race, gender and pregnancy, and she clearly suffered an adverse employment action when terminated. Aramark challenges Myrick's ability to satisfy parts (3) and (4) of her *prima facie* case.

Aramark's argument in relation to element (3) is that Myrick wanted a benefit which neither she nor any other employee was qualified to receive, *i.e.*, leave of absence over and above the 12 weeks of leave guaranteed under the FMLA along with guaranteed reinstatement rights to her job. *See Lang v. Star Herald*, 107 F.3d 1308, 1313 (8th Cir. 1997) ("no one was qualified to receive the benefit [plaintiff] sought, *viz.*, an indefinite unpaid leave of absence with a guarantee of a job when the employee wanted to return to work."); *Martino v. California Federal Bank, FSB*, No. 00 C 0370, 2001 WL 1465140, at *4 (N.D. Ill. 2001) (noting that plaintiff failed to show that she was meeting her employer's legitimate expectations because "[h]er inability to return to work after three months' leave constituted a clear violation of her employer's leave policy."). According to Aramark, Myrick was never guaranteed such rights and she herself admitted that she had read Aramark's employee policy which stated, "Employees who return to work from a family leave of absence within or on the first scheduled day following the expiration of the 12 weeks are entitled to return to their job or an equivalent position[.]" With respect to element (4), Aramark argues in a similar fashion that no similarly situated employee was treated more favorably with respect to reinstatement on return from leave.

12

Myrick, in response, suggests that she sought up to a year of non-FMLA leave with reinstatement rights. She claims that this was allowed by company policy, but provides no evidence of it. Indeed, the evidence in the record is crystal clear that this was not the case. As the Aramark memorandum above explained for leave of absences not protected under the FMLA:

> An unprotected leave is not covered by the Family Medical Leave Act. This type of leave allows an employee to take a leave of absence without guarantee of position or pay. However, a position should be held for an employee as long as possible without causing undue hardship on the component. Examples of unprotected leave include childcare, educational pursuits and any leave extended past the 12 weeks covered by the FMLA.

(Maney Aff. Ex. 4.) Significantly, included as a "leave of absence" "without guarantee of position or pay" in the above is "leave extended past the 12 weeks covered by the FMLA."

Myrick also attempts to point to Serna and Villa as similarly situated employees who received non-FMLA leave for up to a year with reinstatement rights. Plainly, however, this comparison fails for two reasons based on the undisputed facts in the record. First, neither Serna nor Villa were similarly situated with Myrick. To be similarly situated individuals must be comparable in "all respects." *Spath* v. *Hayes Wheels Intern. Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). As one court in this district has phrased it, the individuals "must have held the same or similar employment positions, had similar employment histories, and engaged in misconduct giving rise to the employment action." *Zakaras* v. *United Airlines, Inc.*, 121 F. Supp. 2d 1196, 1212 (N.D. Ill. 2000). Serna served as one of approximately five cashiers, which the undisputed evidence in the record establishes was a position with a high turnover rate. Villa was a catering delivery person assisting with other kitchen preparations. The undisputed evidence again reveals that Villa was one of about 10 in his position and that this entry-level job had a

13

high turnover rate. Myrick, serving as the only bookkeeper/office manager with markedly different responsibilities, was not similarly situated with either Serna or Villa.

Second, and more fundamentally, neither Serna nor Villa received any greater rights than Myrick. Serna and Villa were not granted up to a year of non-FMLA leave with guaranteed reinstatement rights. The evidence in the record, concerning which Myrick has failed to create a triable issue of fact, shows that in each instance Villa and Serna were granted leave with no reinstatements rights. Indeed, they were not even granted the 12 weeks of FMLA leave with guaranteed reinstatement given to Myrick. That Villa and Serna were given jobs on return from their leaves of absences, even though such positions were not guaranteed, is more a product of the two working in high turnover jobs compared to Myrick. It does not establish that they were treated more favorably than Myrick.

The court addresses two other arguments that Myrick makes in this regard. First, she seems to point to her other two maternities leaves as proof that something along the line of "maternity leave" existed separate from FMLA. It is undisputed, however, that her two previous maternity leaves were 8 weeks in length and, therefore, provide little support for her claim that she was entitled to additional time after twelve weeks of FMLA leave expired. Second, Myrick argues that, unlike Villa and Serna, she was not given a warning that her job would be in jeopardy if she were not to return after her 12 weeks of FMLA leave. Once again, Villa and Serna are inappropriate comparisons for Myrick, as those two were provided warnings in all likelihood because they had no reinstatement rights at all, not even during a 12 week FMLA period. Moreover, Myrick's claim that she was not told her employment would cease after her FMLA leave fails insofar as she expressly stated that she read and understood Aramark's policy

that explicitly stated that "[e]mployees who return to work from a family leave of absence within or on the first scheduled day following the expiration of the 12 weeks are entitled to return to their job or an equivalent position without loss of benefit pay."[5] For all of the above reasons, Myrick cannot make out elements (3) or (4) of her *prima facie* case and, as a result, summary judgment is properly granted in favor of Aramark.

Finally, the court notes that even had Myrick made out her *prima facie* case, she fails in her burden to establish pretext. As its legitimate nondiscriminatory reason Aramark asserts that Myrick's position was terminated because she did not return to work after 12 weeks of FMLA leave. Myrick believes that this reason is a pretext for discrimination (1) because of the involvement of Yore and (2) because Aramark has provided inconsistent reasons for terminating her.

To satisfy her burden of establishing pretext, Myrick would have to show that the reason articulated by Aramark was not its true reason for terminating her but instead was a dishonest explanation unworthy of credence. *Zaccagnini v. Chas. Levy Circulating Co.*, 338 F.3d 672, 676 (7th Cir. 2003); *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002). Myrick's first pretext argument–that Yore, who she believes is racist, was involved in the termination–is unpersuasive. The evidence in the record establishes that it was Maney who was the decisionmaker concerning Myrick's termination. The court acknowledges that in some situations the forbidden motive of a subordinate employee can be imputed to the employer, *see Shager v. Upjohn Co.*, 913 F.2d 298, 495 (7th Cir. 1990), but such imputation is not appropriate

---

[5]Moreover, even if Myrick had been given the warning that her job would be in jeopardy had she not returned within 12 weeks of her leave, the undisputed evidence is that Myrick could not have returned to work on July 13, 2001 based on her doctor's orders.

15

here. It would be appropriate "in an instance in which a subordinate, by concealing relevant information from the decisionmaker, is able to manipulate the decisionmaking process and to influence the decision." *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997). The undisputed facts here establish that Maney conducted an independent review of Myrick's case before deciding whether she would be allowed to return to her position with Aramark. As the Seventh Circuit has noted, "when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissive basis, the bias of the subordinate is not relevant." *Id.* As such, this argument fails to establish pretext.

Myrick's second argument–that Aramark gave inconsistent reasons for her termination–also fails. In support of this argument Myrick claims that Maney, when she answered the EEOC charge on December 20, 2001, stated that one of the reasons for Myrick's termination was "[f]ailed to contact her manager." (Pl. L.R. 56.1 ¶ 121.) Read in its entirety, however, the answer to the EEOC charge provides: "[Myrick] failed to return from FMLA leave and failed to contact her manager and therefore [Myrick] was terminated for failure to return from leave." (Pl. Ex. 3 at 0423.) The court agrees with Aramark that there is no inconsistency. Maney states that Myrick was terminated for failure to return from leave. This explanation is "substantially consistent" and there is no "inference of mendacity" required for inconsistent reasons to establish pretext. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 577 (7th Cir. 2003); *see also, Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (noting that summary judgment in favor of employer is proper if the proffered explanations are consistent "in substance if not word choice.").

Accordingly, based on the above, Myrick is unable to create a triable issue of fact concerning her termination. Aramark's motion for summary judgment on Myrick's race, sex and pregnancy discrimination claims, therefore, is granted.

**B.  FMLA**

The FMLA guarantees eligible employees up to twelve weeks of unpaid leave each year for, *inter alia*, the birth of a child or because of a serious health condition. 29 U.S.C. § 2612(a)(1). When an employee returns from FMLA leave in a timely fashion, the employer must reinstate the employee to his or her former or an equivalent position. 29 U.S.C. § 2614(a)(1). While Myrick's brief does not make her FMLA theory entirely clear, it appears that her argument concerns the fact that her FMLA leave was not officially approved until July 10, 2001. Thus, according to Myrick, she was entitled to 12 weeks of FMLA leave from that date and not from April 23, 2001, when her leave actually began.

Helpful in resolving this claim is the Supreme Court's decision in *Ragsdale* v. *Wolverine World Wide Inc.*, 535 U.S. 81 (2003). In *Ragsdale*, the Supreme Court invalidated regulation 29 C.F.R. § 825.700(a), which required that an employer provide notification to an employee of leave being designated under the FMLA in order for such leave to count against the 12 week entitlement. *Id.* at 88. The Supreme Court struck down this regulation, noting that the 12 week period as set out in the statute was both a minimum and a maximum. *Id.* The Court noted that the Secretary of Labor, who promulgated the regulation, lacked the authority to contravene congressional intent and create a windfall for an employee whose employer did not immediately designate the leave as FMLA 12 week leave. *Id.*

17

Similar to *Ragsdale*, adopting Myrick's argument that her 12 week FMLA protected leave started when actually approved would, in essence, provide her a windfall and grant her an extension in the amount of time she is given under the statute. That is contrary to the statute's purpose. Indeed, other courts in this district have so held. *E.g., Strykowski v. Rush N. Shore Med. Ctr.*, No. 02 C 0778, 2003 WL 21788987, at *6 (N.D. Ill. July 30, 2003) ("The extension [plaintiff] asks for today would both undermine and contravene these purposes by allowing him to leave work for medical reasons for nearly 28 weeks and still be afforded protection under the FMLA as if he had only taken the 12 week statutory required period."); *Sewall v. Chicago Transit Auth.*, No. 99 C 8372, 2001 WL 40802, at *5 (N.D. Ill. Jan. 16, 2001) (noting that there "is absolutely no law supporting a finding" that plaintiff's leave should have begun when he was given the FMLA application or when he actually completed the FMLA application because such a policy would allow the employee "a windfall of 4 or 6 weeks of sick leave."). Also worth noting in this regard is that at least part of any delay in her leave being officially approved as FMLA leave was Myrick's own delay in providing the completed "Certification of Health Care Provider" forms. Allowing Myrick to delay the start of her 12 week FMLA leave merely by dragging her feet on the completion of her certification forms is an entirely nonsensical result.

Thus, Myrick was entitled to 12 weeks of FMLA protected leave from April 23, 2001, when she began her leave of absence. Since she was given 12 weeks of leave after that date, she was afforded all that was required under the statute. Accordingly, Aramark's motion for summary judgment on Myrick's FMLA claim is also granted.

## CONCLUSION

For the reasons stated above, Aramark's motion for summary judgment is granted [#14].

The clerk is instructed to enter judgment in favor of the defendant. This case is terminated.

ENTER: *[signature]*
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: April 28, 2004